UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

LINDSAY P. PULLIAM,

    Plaintiff,

v.

FRANK E. PETERSEN, III and
THE LORETTA I. EASTON
REVOCABLE TRUST,

    Defendants.

Civil Action No. TDC-22-1381

## MEMORANDUM OPINION

Plaintiff Lindsay P. Pulliam has filed this civil action against Defendants Frank E. Petersen, III ("Frank Petersen") and The Loretta I. Easton Revocable Trust ("the Trust"), in which she alleges claims of conversion, breach of fiduciary duty, and deceit arising from Frank Petersen's administration of the Trust, for which she seeks injunctive relief. Pending before the Court is Defendants' Motion for Summary Judgment, which is fully briefed. Upon review of the submitted materials, the Court finds that no hearing is necessary. D. Md. Local R. 105.6. For the reasons set forth below, the Motion will be GRANTED.

## BACKGROUND

At issue in this case are the will and trust of Dr. Loretta I. Easton, a resident of Montgomery County, Maryland, who died on August 18, 2018 at the age of 81. Easton was a longtime friend of the Petersen family, which included four siblings: Pulliam, Frank Petersen, Gayle Petersen, and Dana Petersen Moore. Easton was the best friend of the Petersen siblings' mother, knew the Petersen siblings since they were children, and remained close to them until her death. The

Petersen siblings referred to Easton as "Aunt Loretta." Petersen Moore Aff. ¶ 9, Opp'n Ex. 1a, ECF No. 78-1.

After Easton's death, her will was filed with the Office of the Register of Wills of Montgomery County, Maryland ("Register of Wills"). The document that created the Trust, the Declaration of the Loretta I. Easton Revocable Trust ("the Trust Declaration") dated June 19, 2018, was not included in that filing but was produced in the discovery phase of this case. Upon direction by the Court, Defendants have submitted the Trust Declaration as part of the record in this case.

**I.    The Will and Information Report**

In her last will and testament ("the Will"), signed and dated by Easton on June 19, 2018, Easton named Frank Petersen and attorney Rosalind R. Ray as the co-personal representatives for purposes of her will. Among other responsibilities, Easton directed Petersen and Ray to pay out of her estate her funeral and burial expenses, her debts, and all estate, inheritance, and succession taxes. Easton also affirmed that designated beneficiaries of her life insurance policies and annuities should receive the proceeds of those instruments. Easton directly referenced the Trust by stating that she bequeathed her unimproved real property, bank accounts, jewelry, art, books, personal clothing, and remaining assets in her estate to the trustee of the Loretta I. Easton Revocable Trust, to be distributed in accordance with the terms of the Trust. Any remaining vehicles, however, were granted directly to Frank Petersen. The Will also specifically stated that any "relatives, kin, and potential heirs not listed" in the Will had been "purposely, consciously and deliberately omitted" and excluded from the Will. Will at 3, Compl. Ex. 1, ECF No. 1. The Will provided that the co-personal representatives would receive 10 percent of Easton's estate as compensation for their services.

An Information Report filed with the Register of Wills, signed and dated in March 2020 by Frank Petersen, Ray, and attorney Cheryl Chapman Henderson, included a list of Easton's interests in annuities, employee pension or benefit plans, and other similar accounts. The list included seven accounts with cash value, held at various institutions, and included the cash value of each account and the specific successor, owner, or beneficiary of each account. Information Report at 5-6, ECF No. 73-1. The following individuals or entities were the successor, owner, or beneficiary of all or part of one or more of these accounts: Frank Petersen; the Trust and its trustees, Frank Petersen and Ray; Eleanor Anderson; People's Congregational United Church of Christ; Howard University; and Howard University School of Medicine.

## II.  The Trust

In the Trust Declaration, Easton identified Frank Petersen and Ray as the successor co-trustees upon her death or incapacity. The document defines a trustee as "the Administrator or Manager of the trust." Trust Decl. at 2, ECF No. 82-1. The Trust Declaration listed the following nine individuals as beneficiaries who, upon the death of Easton, would receive specified cash amounts that ranged from $2,000 to $10,000: Judy Biagas, Verna Clarke, Monique Gorham, Jerome Bullock, Charles Nearon, Rita Palmer, Lovella Thomas, Darlene Wright Wesley, and June Yeager Perkins.

Additional beneficiaries included the Howard University College of Medicine, the Howard University Undergraduate School, Theater of the Arts Department, and the Howard University Medical Alumni Association (collectively, "the Howard University Entities"), which would each receive a specified percentage of the remaining assets held in the Trust. The Trust Declaration further designated that "all additional assets of the trust including airline miles shall be distributed

to grantor's Friend, Frank E. Petersen, III absolutely." Trust Decl. at 4. It also stated that Easton "has chosen to make no provisions in this trust agreement for anyone not named herein." *Id.* at 5.

### III.  Easton Oral Statements

Pulliam has submitted affidavits from her sisters, Gayle Petersen and Dana Petersen Moore, attesting to oral statements by Easton before her death expressing her intent that the four Petersen siblings receive equal shares of her estate.

According to Gayle Petersen, during multiple visits before and after she became ill, Easton informed Gayle Petersen that she intended to leave her condominium and her other assets to the four Petersen siblings. Gayle Petersen asserts that "on more than one occasion," Easton told her that Frank Petersen "would oversee the division and distribution of all of her other property and that [the four Petersen siblings] would all take equally." G. Petersen Aff. ¶ 8, Opp'n Ex. 1, ECF No. 78-1. On August 4, 2018, when Gayle Petersen visited Easton while she was in the hospital shortly before her death, Easton again said that "she intended for all four of the Petersen children to share equally in her state," then reviewed with Gayle Petersen, using a calculator, various investment accounts each valued at between $75,000 and $90,000. *Id.* ¶ 12.

Gayle Petersen further states that, at an October 14, 2018 meeting at Easton's home following Easton's death, Ray told her that "[t]he girls were not named but she wanted all of you to take equally," and that Easton had listed Frank Petersen's name "as a placeholder" in order to distribute assets equally to the four children. *Id.* ¶ 15. When Gayle Petersen expressed concerns to Ray about whether Frank Petersen would follow Easton's wishes, Ray advised her that she would "have to appeal to his conscience." *Id.* ¶ 16.

In her affidavit, Dana Petersen Moore similarly states that Ray advised her, after Easton's death, that Easton's intent was for her estate "to be shared equally by all four of the Petersen

4

children." Petersen Moore Aff. ¶ 19. According to Petersen Moore, Ray advised Easton that she would need to amend her will in order to reflect these intentions, but Easton responded that she trusted Frank Petersen to follow her wishes and "take care of his sisters as Aunt Loretta wished." Id. ¶ 21. Both Gayle Petersen and Dana Petersen Moore assert that Ray had informed them that she had notes of Easton's intentions for the Petersen children to share in the estate.

At the October 2018 meeting at Easton's home, Frank Petersen told his sisters to "take whatever you want" from among her personal effects. Id. ¶ 15. However, in discussions with Gayle Petersen, Frank Petersen was "adamant" that all of the money belonged only to him. G. Petersen Aff. ¶ 18. On multiple occasions between March and August 2021, following an inquiry by Pulliam, Frank Petersen emailed his sisters to inform them of progress on repairs to Easton's condominium and on the sale of the property.

## IV.  Procedural History

On June 6, 2022, Pulliam filed the present action against Defendants in which she asserted claims under state law for conversion, breach of fiduciary duty, and deceit, for which she requested injunctive relief. In the Complaint, Pulliam asserts that she was entitled to $140,438.65 from Easton's estate. Although her name is not listed in the Will, Pulliam contends that, pursuant to Easton's intentions, Frank Petersen was required to distribute the money allocated to him equally among himself and his three sisters, including Pulliam. Pulliam asserts that Petersen instead kept the money for his personal use, in violation of his fiduciary duties as an administrator of the Trust and contrary to Easton's intention that Pulliam was to be a beneficiary.

Defendants filed a Motion to Dismiss in which they argued that Pulliam did not have standing to bring the suit and that she failed to demonstrate that the amount in controversy is greater than $75,000 as required to establish subject matter jurisdiction based on diversity

jurisdiction. After hearing argument on the Motion, the Court denied the Motion on July 10, 2023. Defendants then filed an Answer, after which the parties proceeded with discovery.

## DISCUSSION

In the Motion for Summary Judgment, Defendants seek summary judgment in their favor on all claims. Defendants argue that Pulliam is not entitled to any proceeds from Easton's estate because she is not named as a beneficiary in either the Will or the Trust. Based on these same facts, Defendants also renew their argument that Pulliam lacks standing to bring this action, and that she has failed to establish the requisite amount in controversy to establish diversity jurisdiction.

### I. Legal Standard

Under Federal Rule of Civil Procedure 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

## II. Subject Matter Jurisdiction

As a threshold matter, the Court rejects Defendants' renewed arguments that Pulliam lacks subject matter jurisdiction, whether based on a lack of standing or a failure to establish the amount in controversy. These arguments are identical to those previously asserted in the Motion to Dismiss, and the Court rejected them for the reasons stated on the record at the July 10, 2023 hearing, which the Court incorporates here by reference. That same reasoning applies now. Where diversity jurisdiction is evaluated at the outset of the case, a later finding that Pulliam was not able to establish by the end of the case that Defendants are liable for a loss of more than $75,000 would not eliminate subject matter jurisdiction. *JTH Tax, Inc. v. Frashier*, 624 F.3d 635, 638 (4th Cir. 2010) (holding that, generally, the sum asserted in the plaintiff's complaint "controls the amount in controversy determination" if alleged in good faith). Likewise, the record evidence is sufficient to show that Pulliam had standing in that she had a cognizable injury traceable to Defendants' conduct that could be redressed by a favorable ruling. *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). To the extent that Defendants argue that Pulliam's claims fail, they are most properly addressed on the merits.

## III. Will and Trust

Defendants argue that they are entitled to summary judgment because the Will and the Trust provide no basis to support Pulliam's claim that she is entitled to any monies or assets from the Easton estate, as she was not even mentioned in the Will or Trust, much less identified as a beneficiary. Pulliam argues that there is a genuine issue of material fact on Easton's intent to include all of the Petersen siblings as beneficiaries of the Will or Trust, based on the affidavits of Gayle Petersen and Dana Petersen Moore, which recount statements made by Easton or Ray that illustrate that intent. Where Pulliam disavows arguing that Easton's statements referenced in the

7

affidavits constituted a nuncuperative, or oral, will, Opp'n at 7, ECF No. 78, the Court need not and will not address Defendants' argument relating to nuncuperative wills.

The Court of Appeals of Maryland, now the Supreme Court of Maryland ("the Maryland Supreme Court"), has held that when construing both wills and trusts, "the paramount concern of the court is to ascertain and effectuate the testator's expressed intent." *Vito v. Grueff*, 160 A.3d 592, 602 (Md. 2017) (quoting *Friedman v. Hannan*, 987 A.2d 60, 67 (Md. 2010)). In doing so, however, "effect must be given to the express meaning of the testator's words, rather than what the court might presume the intent of the testator to be." *Id.* at 602-03 (citing *Banghart v. Vieweg*, 274 A.2d 333, 336 (1971)). Notably, the testator's intent "must be divined from the four corners of the [instrument]." *Id.* at 603. "[E]xtrinsic evidence is inadmissible unless it clarifies an ambiguous testamentary intent." *Id.* at 603. Thus, "where the language of the testator is plain and unambiguous such language must govern, and therefore extrinsic evidence is inadmissible to show that [the testator] meant something different from what [the testator's] language imports." *Id.* (quoting *Walston's Lessee v. White*, 5 Md. 297, 304 (Md. 1853)).

Upon review of both the Will and the Trust, the Court finds that Pulliam is not named as a beneficiary of any of Easton's named assets. Pulliam is not referenced in either document at all, whether by name or description. Moreover, although Pulliam argues that Easton's intent was to have the four Petersen siblings receive equal shares of assets, neither of her two sisters, Gayle Petersen and Dana Petersen Moore, is referenced in either document, by name or description. Rather, the only member of the Petersen family referenced in the Will is Frank Petersen, who is identified as one of the personal representatives and as the recipient of Easton's vehicles. The Will also specifically states that "[a]ll relatives, kin, and potential heirs not listed" in the Will "are purposely, consciously and deliberately omitted" and "knowingly excluded" from the Will. Will

at 3. The Will therefore unambiguously does not include Pulliam as a beneficiary. Notably, the list of owners, successors, and beneficiaries of the annuities and related accounts, filed with the Register of Wills, also does not include Pulliam or her sisters.

As for the Trust, which is referenced in the Will, it again identifies only one of the Petersen siblings, Frank Petersen, who is designated as a residuary beneficiary of the Trust to whom all additional assets of the Trust are to be distributed "absolutely." Trust Decl. at 3. While Pulliam argues that Frank Petersen's name was listed as a placeholder, as "a matter of convenience," and that Easton's intent was for him to share the money from the corresponding financial assets equally among the four Petersen siblings, Opp'n at 2, the language of the Trust cannot be read in any way to exhibit that intent. Significantly, the Trust also names other individuals and organizations as beneficiaries of Easton's assets. For example, the Trust lists each of the Howard University Entities as a beneficiary of a certain percentage of Easton's residuary estate. It also lists nine other individuals, none of whom were Pulliam or her sisters, as beneficiaries of certain amounts of money, ranging from $2,000 to $10,000. These references to other named beneficiaries demonstrate a clear intent to convey Easton's assets to specific, identified beneficiaries other than Pulliam and her sisters. Finally, the statement in the Trust Declaration that "[t]he grantor has chosen to make no provisions in this trust agreement for anyone not named herein" is explicit and unambiguous. Trust Decl. at 5. The Court therefore finds that, based on the four corners of Easton's Will and Trust, those instruments are unambiguous as to her testamentary intent, and they unambiguously do not exhibit any intent to distribute equally the entirety of Easton's assets, or even those specifically bequeathed to Frank Petersen, among the four Petersen siblings.

## IV. Extrinsic Evidence

Based on this finding, the Court may not and will not consider the extrinsic evidence offered by Pulliam on the issue of Easton's intent, consisting of the affidavits of Gayle Petersen and Dana Petersen Moore and the emails exchanged between the four Petersen siblings regarding the sale of Easton's condominium. As discussed above, "extrinsic evidence is inadmissible" in interpreting a will or trust "unless it clarifies an ambiguous testamentary intent." *See Vito*, 160 A.3d at 603.

Pulliam's argument that the extrinsic evidence nevertheless may be considered is not persuasive. Pulliam relies on *National Society of the Daughters of the American Revolution v. Goodman*, 736 A.2d 1205 (Md. Ct. Spec. App. 1999) ("*Goodman*"), decided by the Court of Special Appeals of Maryland, now the Appellate Court of Maryland ("the Maryland Appellate Court"). In *Goodman*, the decedent had executed a will which left 20 percent of her estate to a Daughters of the American Revolution ("DAR") nursing home, but prior to her death and after learning that the DAR did not operate a nursing home, she had informed her attorney that she instead wished for the funds to be allocated to the nursing home to be given to Gallaudet University, the intended beneficiary of the other 80 percent of her estate, but that intent was never memorialized in a revised executed will. *Id.* at 1207-08. The court upheld the admission of extrinsic evidence consisting of the attorney's testimony on what the decedent's "testamentary intention would be if the bequest to the [] nursing home lapsed." *Id.* at 1209-10. *Goodman*, however, involved a particular circumstance—the assessment of whether, when a charitable bequest is impossible to enforce, the equitable *cy pres* doctrine could be applied to reform the provision, in that case, by granting the 20 percent to DAR for other purposes. *Id.* at 1210. Notably, in an earlier opinion in the case, the Maryland Appellate Court had held that extrinsic evidence

10

may be considered along with the text of a will with inconclusive language, but in the specific circumstance under which the court must assess whether, as required for the application of the *cy pres* doctrine, the decedent had manifested a "general charitable intent." *Gallaudet Univ. v. Nat'l Soc'y of the Daughters of the Am. Revolution*, 699 A.2d 531, 546-47 (Md. Ct. Spec. App. 1997). Here, Pulliam's claim does not involve a charitable bequest such that there is any basis to assert that the *cy pres* doctrine is at issue, so this rule permitting the consideration of extrinsic evidence to address a specific scenario does not apply here. Thus, *Goodman* does not provide a basis to deviate from the general rule that extrinsic evidence is not admissible to interpret the decedent's intent when the language of a will or trust is unambiguous.

The Court therefore need not and does not address the question of whether the contents of the Gayle Petersen and Dana Petersen Moore affidavits are admissible as statements of a then-existing mental, emotional, or physical condition. *See* Fed. R. Evid. 803(3). In any event, the Court notes that the statements in both affidavits referencing Ray's account of her discussions with Easton are inadmissible, at a minimum, because there are two layers of out-of-court statements such that the declarants lacked personal knowledge of those discussions. *See* Fed. R. Civ. P. 56(c)(4) (stating that an affidavit or declaration submitted to support or oppose a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated"); Fed. R. Evid. 805; *Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (stating that summary judgment affidavits cannot be "based upon hearsay").

The Court also observes that, even if the affidavits could be considered, they reflect that Easton's attorney had correctly determined, and Pulliam's sister was informed, that Easton's oral statements could not actually provide a basis to add Pulliam and her sisters as beneficiaries. As

acknowledged by Easton's attorney while describing Easton's oral statements of intent, where Easton never effectuated an amendment to the unambiguous Will or Trust to memorialize such an intent, even after apparently receiving advice from counsel that she would need to do so to reflect that intention, *see* Petersen Moore Aff. ¶ 21, the only recourse available to Pulliam to cause her brother to act in accordance with any such wishes is "an appeal to his conscience." G. Petersen Aff. ¶ 15.

For all of these reasons, the Court finds that the Will and the Trust are unambiguous such that there is no genuine issue of material fact on whether Pulliam is entitled to some portion of Easton's assets. Because such an entitlement is a necessary predicate to all of Pulliam's claims, the Court must grant summary judgment in favor of Defendants. In so ruling, the Court does not decide whether Easton actually expressed an intent to share her estate with all four of the Petersen siblings. If, in fact, a decedent was known to have intended to have multiple siblings share in an inheritance and trusted one to effectuate that intent, that sibling, as a matter of conscience, likely should carry out those wishes. But where Maryland law does not permit this Court to consider or rely upon such extrinsic statements of intent, this Court may not order that result. *See Vito*, 160 A.3d at 603.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment will be GRANTED. A separate Order shall issue.

Date: July 22, 2024

THEODORE D. CHUANG
United States District Judge